# EXHIBIT 5

**CNA**

**Policy Holder Notice – Maryland**

# IMPORTANT INFORMATION

## NOTICE – OFFER OF TERRORISM COVERAGE; DISCLOSURE OF PREMIUM

**THIS NOTICE DOES NOT FORM A PART OF THE POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

As used herein, 1) "we" means the insurer listed on the Declarations; and 2) "you" means the Named Insured listed on the Declarations.

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally, the Act provided that to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 re-authorization of the Act removed the requirement that the act of terrorism must be committed by or on behalf of a foreign interest, and now certified acts of terrorism may encompass, for example, a terrorist act committed against the United States government by a United States citizen, when the act is determined by the federal government to be "a certified act of terrorism."

In accordance with the Act, we are required to offer you the ability to purchase coverage for losses resulting from an act of terrorism that is certified under the federal program. The other provisions of this policy, including nuclear, war or military action exclusions, will still apply to such an act.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The Department of the Treasury will pay a share of terrorism losses insured under the federal program. In 2015, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  Such federal share shall decrease by 1 percentage point per calendar year until equal to 80%, and therefore the federal share shall be 84% in 2016, 83% in 2017, 82% in 2018, 81% in 2019, and 80% in 2020 and any calendar year thereafter.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.



4020000326011795632862B

---

Copyright CNA All Rights Reserved.



**Policy Holder Notice – Maryland**

Further, this coverage is subject to a limit on our liability pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

CONFIRMATION OF ACCEPTANCE OF COVERAGE

In accordance with the Act, we offered you coverage for losses resulting from an act of terrorism that is certified under the federal program. This notice confirms that you have chosen to accept our offer of coverage for certified acts of terrorism. The policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an act. The premium charge for terrorism coverage is shown separately on the Declarations.

 Copyright CNA All Rights Reserved.

**CNA**

**Policy Holder Notice**

# IMPORTANT INFORMATION

## FOR OUR COMMERCIAL UMBRELLA PLUS POLICY HOLDERS - ATTACHMENT OF RESTRICTIVE ENDORSEMENT

The endorsement entitled **UNDERLYING INSURANCE COVERAGE LIMITATION ENDORSEMENT** has been attached to your policy.  Due to attaching this endorsement, the coverage provided by this policy can be no broader than the coverage provided by "scheduled underlying insurance" and may be less broad, if this policy incorporates any exclusions or other restrictions that are not present in "scheduled underlying insurance."

If you have any questions, please contact your independent agent.





CNA86388XX (7-16)                    Copyright CNA All Rights Reserved.                    Page 1 of 1



# IMPORTANT INFORMATION

## NOTICE - OFFER OF TERRORISM COVERAGE
## NOTICE - DISCLOSURE OF PREMIUM

**THIS NOTICE DOES NOT FORM A PART OF YOUR POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY**

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally the Act provides that to be certified an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 reauthorization of the Act no longer requires the act of terrorism to be committed by or on behalf of a foreign interest and certified acts of terrorism now encompass, for example, a terrorist act committed against the United States government by a United States citizen when the act is determined by the federal government to be "a certified act of terrorism."

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism that is certified under the federal program. The policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an act. The premium charge for terrorism coverage is shown separately on your Policy Declarations, and is also included in the total premium.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

LIMITATION ON PAYMENT OF TERRORISM LOSSES (applies to policies which cover terrorism losses insured under the federal program, including those which only cover fire losses)

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

Further, this coverage is subject to a limit on our liability, pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.



---

G-144233-F
(Ed. 01/08)



**Commercial Umbrella**


**Renewal Declaration**


| POLICY NUMBER | COVERAGE PROVIDED BY | FROM - POLICY PERIOD - TO |
|---|---|---|
| B 6011795632 | CONTINENTAL CASUALTY COMPANY | 11/01/2017    11/01/2018 |
| | 333 S. WABASH | |
| | CHICAGO, IL.  60604 | |

**INSURED NAME AND ADDRESS**
MORABITO CONSULTANTS INC
952 RIDGEBROOK RD
SUITE 1700
SPARKS GLENCOE, MD  21152

**REFER TO ADDITIONAL NAMED INSUREDS SCHEDULE**

**AGENCY NUMBER**
982158

**AGENCY NAME AND ADDRESS**
MASON & CARTER INC
23 SOUTH STREET
BALTIMORE, MD  21202
Phone Number: (410)539-6767

**BRANCH NUMBER**
505

**BRANCH NAME AND ADDRESS**
BALTIMORE BRANCH
1954 GREENSPRING DR STE 450
TIMONIUM, MD  21093
Phone Number: (410)453-4480


This policy becomes effective and expires at 12:01 A.M. standard time at your mailing
address on the dates shown above.

The Named Insured is a Corporation.

Your policy is composed of this Declarations, with the attached Coverage Forms, and
Endorsements if any.  The Policy Forms and Endorsement Schedule shows all forms
applicable to this policy at the time of policy issuance.

**PREMIUM**



| Premium Basis | Estimated Exposure | Rate | Estimated Advance Premium |
|---|---|---|---|
| Flat Charge | | | ███ |

Minimum Premium:    ███        Annual        Total Advance Premium:   ███

Your Premium includes the following amount for
Certified Acts of Terrorism Coverage                  ███

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 6011795632 | MEDBIKE CONSULTING INC |
| | 952 RIDGEBROOK RD |
| | SUITE 1700 |
| | SPARKS GLENCOE, MD   21152 |

Audit Period is Not Auditable

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 6011795632 | MOBILE CONSULTANTS INC |
| | 952 RIDGEBROOK RD |
| | SUITE 1700 |
| | SPARKS GLENCOE, MD  21152 |

## POLICY LIMITS OF INSURANCE

Each Incident:    $5,000,000    Aggregate:    $5,000,000

## RETAINED LIMIT

Retained Limit: $0

## SCHEDULE OF UNDERLYING INSURANCE

| Underlying Insurer Policy Number Policy Period | Underlying Insurance | Coverages | LimitS of Insurance |
|---|---|---|---|
| National Fire Ins Co. Hartford<br><br>6011794867<br><br>Eff: 11/01/2017 to 11/01/2018 | General Liability | Each Occurrence Limit<br><br>General Aggregate Limit<br>  Applies per location<br>  Applies per project<br><br>Products/Completed Operations Aggregate Limit<br><br>Personal and Advertising Injury Liability Limit | $1,000,000<br><br>$2,000,000<br><br><br><br>$2,000,000<br><br><br>$1,000,000 |
| National Fire Ins Co. Hartford<br><br>6021296111<br><br>Eff: 11/01/2017 to 11/01/2018 | Automobile Liability | Combined Bodily Injury and Property Damage Liability:<br>  Each Accident Limit<br>------------or------------<br>Bodily Injury Liability:<br>  Each Person Limit<br>  Each Accident Limit<br><br>Property Damage Liability:<br>  Each Accident Limit | <br><br>$1,000,000<br>----------<br><br>$<br>$<br><br><br>$ |
| TRUMBULL INSURANCE COMPANY<br><br>30WECEL1277<br><br>Eff: 11/01/2016 to 11/01/2017 | Employers Liability | Bodily Injury By Accident:<br>  Each Accident Limit<br><br>Bodily Injury By Disease:<br>  Each Employee Limit<br>  Policy Limit | $1,000,000<br><br><br>$1,000,000<br>$1,000,000 |



**POLICY NUMBER**
B 6011795632

**INSURED NAME AND ADDRESS**
3 ME MOBILE CONCRETE, INC
952 RIDGEBROOK RD
SUITE 1700
SPARKS GLENCOE, MD   21152

<u>**ADDITIONAL NAMED INSUREDS SCHEDULE**</u>

3 ME PROPERTIES LLC

3 ME ENTERPRISES LLC

INSURED                    Page   4 of   5

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 6011795632 | ACME PAVING AND GRADING, INC<br>952 RIDGEBROOK RD<br>SUITE 1700<br>SPARKS GLENCOE, MD  21152 |

### FORMS AND ENDORSEMENTS SCHEDULE

| Form Number | | Form Title |
|---|---|---|
| CG0201 | 10/2009 | Maryland Changes |
| CNA80664XX | 11/2014 | Underlying Insurance Coverage Limitation Endt |
| G115922A | 06/1995 | Aircraft Limitation |
| G116393B | 07/2005 | Contractual Liability Limitation |
| G133136B | 07/2005 | Bridge Endorsement |
| G134841B | 07/2005 | Architects, Engineers or Surveyors Extension |
| G138949A | 11/2000 | Maryland Policyholder Notice |
| G142553B | 07/2005 | Fungi/Mold/Mildew/Yeast/Microbe Exclusion Contract |
| G15057C | 06/2005 | Commercial Umbrella Plus Coverage Part |
| G16375E | 01/2004 | Contractor Limitation Endorsement |
| G300912A | 02/2010 | Pollution Exclusion Amendment |
| G300982A | 07/2010 | Crisis Management Coverage Endorsement |
| G301134A | 10/2010 | Key Employee Replacement Expense Coverage Endt |
| G48437A | 10/2011 | Waiver of Subrogation |
| IL0017 | 11/1998 | Common Policy Conditions |

### *** PLEASE READ THE ENCLOSED IMPORTANT NOTICES CONCERNING YOUR POLICY ***

| Form Number | | Form Title |
|---|---|---|
| CNA68021XX | 02/2013 | Notice of Cancellation to Certificateholders |
| CNA81758MD | 03/2015 | Notice - Offer Of Terr Cov, Disclosure Of Prem |
| CNA86388XX | 07/2016 | Policy Holder Notice |
| G144233F | 01/2008 | Notice - Offer of Terrorism Disclosure of Premium |



_____

Countersignature

**Chairman of the Board**

Secretary

COMMERCIAL GENERAL LIABILITY
CG 02 01 10 09

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MARYLAND CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2.** When this policy has been in effect for 45 days or less and is not a renewal policy, we may cancel this Coverage Part by mailing to the first Named Insured, at the last mailing address known to us, written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**b.** 15 days before the effective date of cancellation if we cancel because the risk does not meet our underwriting standards.

**3.** When this policy has been in effect for more than 45 days or is a renewal policy, we may cancel this policy by mailing to the first Named Insured, at the last mailing address known to us, written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**b.** 45 days before the effective date of cancellation if we cancel for a permissible reason other than nonpayment of premium, stating the reason for cancellation. Under this Paragraph **b.,** we may cancel only for one or more of the following reasons:

**(1)** When there exists material misrepresentation or fraud in connection with the application, policy, or presentation of a claim.

**(2)** A change in the condition of the risk that results in an increase in the hazard insured against.

**(3)** A matter or issue related to the risk that constitutes a threat to public safety.

If we cancel pursuant to Paragraph **3.b.,** you may request additional information on the reason for cancellation within 30 days from the date of our notice.

**B.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be calculated as follows:

**a. Policies Written For One Year Or Less**

We will refund 90% of the pro rata unearned premium.

**b. Policies Written For More Than One Year**

**(1)** If the policy is cancelled in the first year, we will refund 90% of the pro rata unearned premium for the first year, plus the full annual premium for subsequent years.

**(2)** If the policy is cancelled after the first year, we will refund the pro rata unearned premium.

**c. Continuous And Annual Premium Payment Policies**

We will refund 90% of the pro rata unearned premium for the year in which the policy is cancelled.

We will retain the minimum premium, except if the policy is cancelled as of the inception date.

4002000026011795632863400000004

However, if this policy is financed by a premium finance company and we or the premium finance company or the first Named Insured cancels the policy, the refund will consist of the gross unearned premium computed pro rata, excluding any expense constant, administrative fee or nonrefundable charge filed with and approved by the insurance commissioner.

The cancellation will be effective even if we have not made or offered a refund.

**C.** Paragraph **6.** of the **Cancellation** Common Policy Condition is replaced by the following:

We will send notice of cancellation to the first Named Insured by certificate of mail if:

    **a.** We cancel for nonpayment of premium; or

    **b.** This policy is not a renewal of a policy we issued and has been in effect for 45 days or less.

We will send notice to the first Named Insured by certificate of mail or by commercial mail delivery service if we cancel for a reason other than nonpayment of premium and this policy:

    **a.** Is a renewal of a policy we issued; or

    **b.** Has been in effect for more than 45 days.

We will maintain proof of mailing in a form authorized or accepted by the United States Postal Service or by other commercial mail delivery service when such service is used. Proof of mailing will be sufficient proof of notice.

**D.** The following condition is added and supersedes any provisions to the contrary:

**When We Do Not Renew**

    **1.** We may elect not to renew this policy by mailing notice of nonrenewal to the first Named Insured at the last mailing address known to us at least 45 days before the expiration date of this policy.

    **2.** We will send notice of nonrenewal to the first Named Insured by certificate of mail or by commercial mail delivery service. We will maintain proof of mailing in a form authorized or accepted by the United States Postal Service or by other commercial mail delivery service when such service is used. Proof of mailing will be sufficient proof of notice.

    **3.** When we elect not to renew a policy that has been in effect for more than 45 days for a reason other than nonpayment of premium, we will provide a written statement of the actual reason for the refusal to renew. You may request additional information within 30 days from the date of our notice.

    **4.** If we offer to renew at least 45 days before the renewal date and you fail to make the required premium payment by the renewal date, the policy will terminate on the renewal date for nonpayment of premium.

Copyright Insurance Services Office, Inc., 2009

**CNA**

# UNDERLYING INSURANCE COVERAGE LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA PLUS COVERAGE PART**

It is understood and agreed as follows:

**SECTION I – COVERAGES**, the paragraph entitled **Exclusions** is amended with the addition of the following exclusion:

This insurance does not apply to:

**Underlying Insurance Coverage Limitation**

Notwithstanding anything to the contrary, this policy does not provide broader coverage than that which is provided by any "scheduled underlying insurance."

In the event of any difference between:

a.   exclusions, restrictions, limiting terms or conditions in this policy, and

b.   exclusions, restrictions, limiting terms or conditions in the "scheduled underlying insurance"

addressing the same general risk or hazard, then the more restrictive provision shall apply.

All other terms and conditions of the Policy remain unchanged.

---

CNA80664XX (Ed. 11-14)                                                                                         Page 1 of 1

Copyright, CNA  All Rights Reserved.


**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AIRCRAFT LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

It is agreed that exclusion **h.** of **SECTION I – COVERAGES** is deleted and replaced by the following:

This insurance does not apply to:

**h.**   Liability arising out of the ownership, maintenance, operation, use, or "loading or unloading" of any "aircraft".

However, this exclusion does not apply if liability for "aircraft" is scheduled in this policy's Schedule of Underlying Insurance for the full limits shown, and then only for such liability for which coverage is afforded under the "scheduled underlying insurance".

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

The Contractual Liability exclusion, paragraph **2.b. Exclusions** (Section **I**) is deleted and replaced with the following:

This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

This exclusion does not apply to liability for "ultimate net loss" that the insured would have in the absence of the contract or agreement.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BRIDGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

Any "state amendatory" endorsement which is listed in the Commercial Umbrella Plus Coverage Part Declarations will modify the Commercial Umbrella Plus Coverage Part, even if the endorsement does not state that it will modify the Commercial Umbrella Coverage Part.

For the purposes of this endorsement, a "state amendatory" endorsement means any Insurance Services Office (ISO) state cancellation, nonrenewal, or amendatory endorsement which begins with an IL or CG prefix.

When a "state amendatory" endorsement is attached to the Commercial Umbrella Plus Coverage Part, the term claim, as used in the "state amendatory" endorsement, shall mean "ultimate net loss" as defined in the Commercial Umbrella Plus Coverage Part.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ARCHITECTS, ENGINEERS AND SURVEYORS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

1. **Extended Property Damage**

   Exclusion **2.a.** of SECTION I, is deleted and replaced with the following:

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

2. **Participation in Professional Joint Ventures**

   A. The second paragraph of **1.b.** of **SECTION II. WHO IS AN INSURED** is deleted and replaced by the following:

      You are also an insured for your participation in a past or present joint venture that is not stated in the Declarations, but only if such joint venture meets all of the following criteria:

      (1) Each and every one of your co-venturers are architectural, engineering or surveying firms;

      (2) The joint venture has no direct employees; and

      (3) The joint venture does not own, rent or lease any real or personal property.

      You are insured for the conduct of your business within such a joint venture. You are also insured for your liability for the acts or omissions of other co-venturers in the conduct of the business of such a joint venture.

      This insurance is excess over any other insurance available to such a joint venture, whether primary, excess, contingent, or on any other basis.

3. **Total Pollution Exclusion (With exceptions for certain hostile fire and automobile exposures)**

   Exclusion **2.f.** of SECTION I is deleted in its entirety and replaced by the following:

   This insurance does not apply to:

   f. (1) "Bodily injury," "property damage" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal,

seepage, migration, release or escape of "pollutants" at any time.

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location not owned or occupied by, or rented or loaned to any insured;

(c) That are, or that are contained in any property that is:

   (i) being transported or towed by, or handled for movement into, onto or from a covered "automobile";

   (ii) otherwise in the course of transit; or

   (iii) being stored, disposed of, treated or processed in or upon the covered "automobile";

Subparagraphs **(a)** and **(b)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire unless that hostile fire occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) While any insured, or any contractors or subcontractors working directly or indirectly on any insured's behalf, are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants" at any premises, site or location.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Subparagraph **(b)** does not apply with respect to "pollutants" not in or upon a covered "automobile" if:

(i) The "pollutants" or property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered



"automobile" and the discharge, dispersal, release or escape of the "pollutants" is caused directly by such upset, overturn or damage; and

**(ii)** The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" happens:

    **(aa)** Before the "pollutants" or property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "automobile"; or

    **(bb)** After the "pollutants" or property in which the "pollutants" are contained are moved from the covered "automobile" to the place where they are finally delivered, disposed of, or abandoned by the insured.

Subparagraph **(c)** does not apply to fuels, lubricants, fluids, exhaust, gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "automobile" or its parts if:

**(i)** The "pollutants" escape or are discharged, dispersed or released directly from an "automobile" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(ii)** The "bodily injury," "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs **f.(2)** and **f.(3)** of the definition of "mobile equipment."

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

Paragraph **(2)** of this exclusion does not apply to "property damage" arising out of heat, smoke or fumes from a hostile fire that is neither excluded by Paragraph **(1)** above, nor arises out of the ownership, maintenance or use of an "automobile." However, this exception to Paragraph **(2)** does not apply to any loss, cost or expense arising out of any request, demand, order or statutory requirement or claim or "suit" solely by or behalf of a governmental authority.

4. **Professional Liability Exclusion**

The following exclusion is added to paragraph **2., Exclusions** of SECTION **I**

**1.** This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

    **a.** Providing engineering, architectural, or surveying services to others in your capacity as an engineer, architect or surveyor; and

    **b.** Providing or hiring independent professionals to provide engineering, architectural, or surveying services in connection with construction work you perform.

**2.** Subject to Paragraph **3.** below, professional services include:

    a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    **b.** Supervisory or inspection activities performed as part of any related architectural, engineering, or surveying activities;

**3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI / MOLD / MILDEW / YEAST / MICROBE EXCLUSION – CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE FORM

**A.** The Fungi and Microbes exclusion in Paragraph **2., Exclusions,** of **Section I – Coverages** is replaced by the following :

This insurance does not apply to:

**Fungi and Microbes**

**(1)** "Bodily injury" or "personal and advertising injury" arising out of or relating to, in whole or in part, the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or growth or presence of any "fungi" or "microbes." This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense. But this exclusion does not apply where your business is food processing, sales, or serving, and the "bodily injury" is caused solely by food poisoning in connection with such processing, sales, or serving.

**(2)** "Property damage" arising out of or relating to the actual, alleged or threatened contact with, exposure to, existence of, or growth or presence of any "fungi" or "microbes."

**(3)** Any loss, cost or expense arising out of or relating to the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assessing the effects of "fungi" or "microbes" by any insured or by anyone else.

**B.** The following condition is added to **Section IV – Conditions:**

**Arbitration**

For "property damage," the determination of what portion of a loss is attributable to "fungi" and "microbes," and what portion is not, shall be made by us. If you disagree with that determination, you and we agree to submit to binding arbitration according to the Commercial Arbitration Rules of the American Arbitration Association, or according to such other rules as you and we agree to. If binding arbitration of insurance disputes is not allowed in the state where you are incorporated (or, if you are not a corporation, the state where you are domiciled), then arbitration shall be non-binding, and shall only proceed if both you and we agree to enter into it. The arbitration will be held in the county where you are headquartered, or at such other location as may be jointly agreed to by the arbitrators. Each party will bear its own arbitration costs.

G-142553-B
(Ed. 07/05)

Incorporates materials copyrighted by Insurance Services Office, reprinted with their permission.

Page 1 of 1



G-15057-C
(Ed. 06/05)

# COMMERCIAL UMBRELLA PLUS
# COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured identified under **SECTION II – WHO IS AN INSURED** of this policy.

The word "insured" means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED.**

The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V – DEFINITIONS.**

## SECTION I – COVERAGES

**1. Insuring Agreement**

We will pay on behalf of the insured those sums in excess of "scheduled underlying insurance," "unscheduled underlying insurance" or the "retained limit" that the insured becomes legally obligated to pay as "ultimate net loss" because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

**a.** This insurance applies to "bodily injury" and "property damage" only if:

  **(1)** The "bodily injury" or "property damage" is caused by an "incident" anywhere in the world;

  **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

  **(3)** With respect to "bodily injury" or "property damage" that continues, changes or resumes so as to occur during more than one policy period, both of the following conditions are met:

    **(i)** Prior to the policy period, no "authorized insured" knew that the "bodily injury" or "property damage" had occurred, in whole or in part; and

    **(ii)** During the policy period, an "authorized insured" first knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

  For purposes of this Paragraph **(1) a.(3)** only, if **(a)** "bodily injury" or "property damage" that occurs during this policy period does not continue, change or resume after the termination of this policy period; and **(b)** no "authorized insured" first knows of this "bodily injury" or "property damage" until after the termination of this policy period, then such first knowledge will be deemed to be during this policy period.

**b.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any "authorized insured" includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**c.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any "authorized insured":

  **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

  **(2)** Receives a written or verbal demand, claim or "suit" for damages because of the "bodily injury" or "property damage"; or

  **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** This insurance applies to "personal and advertising injury" caused by an "incident" committed anywhere in the world during the policy period.

If we are prevented by law, statute or otherwise from paying on behalf of the insured, then we will indemnify the insured for those sums that the insured is legally obligated to pay as "ultimate net loss" because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

**2. Exclusions**

This Insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property. This exclusion does not apply to Employers Liability claims for "bodily injury" covered by "scheduled underlying insurance."

**b. Contractual Liability**

"Bodily injury," "property damage" or "personal and advertising injury" for which the insured is obligated to pay damages by reason of the

assumption of liability in a contract or agreement. This exclusion does not apply to liability for "ultimate net loss":

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Because of "bodily injury" or "property damage" assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

**c.** **"Personal and advertising injury" Exclusions**

"Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**(4)** Arising out of a criminal act committed by or at the direction of the insured;

**(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(6)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(7)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(8)** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights;

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan;

**(9)** Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of websites for others; or

**(c)** An Internet search, access, content or service provider;

However, this exclusion does not apply to paragraphs **10. a., b.** and **c.** of "personal and advertising injury" under **SECTION V – DEFINITIONS**;

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(10)** Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control; or

**(11)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**d.** **Workers' Compensation and Similar Laws**

Any obligation of the insured under a:

**(1)** Workers' compensation;

**(2)** Disability benefits; or

**(3)** Unemployment compensation

law or any similar law.

**e.** **Employers Liability**

"Bodily injury" to:

**(1)** An employee of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that employee as a consequence of **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply:

**(1)** To liability assumed by the insured under an "insured contract"; or

**(2)** Only to the extent that coverage is provided by "scheduled underlying insurance."

4002000326011795632863 9

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(i)** If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

**(ii)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

**(e)** That are, or that are contained in property that is:

**(i)** Being transported or towed by, or handled for movement into, onto or from a covered "automobile";

**(ii)** Otherwise in the course of transit;

**(iii)** Being stored, disposed of, treated or processed in or upon the covered "automobile";

**(f)** Before the "pollutants" or property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "automobile"; or

**(g)** After the "pollutants" or property in which the "pollutants" are contained are moved from the covered "automobile" to the place where they are finally:

**(i)** Delivered;

**(ii)** Disposed of; or

**(iii)** Abandoned

by the insured.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Subparagraph **(d)(i)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants, or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraph **(e)(iii)** does not apply to fuels, lubricants, fluids, exhaust, gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "automobile" or its parts if the "pollutants" escape or are discharged, dispersed or released directly from an "automobile" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants."

Subparagraphs **(f)** and **(g)** do not apply if the "pollutants" or property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "automobile" and the discharge, dispersal, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**(2)** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(3)** Any loss, cost or expense arising out of any:

  **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

  **(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

**g. Watercraft**

"Bodily injury" or "property damage" arising out of the:

**(1)** Ownership;

**(2)** Maintenance;

**(3)** Use; or

**(4)** Entrustment to others

of a "watercraft" owned or operated by or rented or loaned to an insured. Use includes operation or "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "incident" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A "watercraft" while ashore on premises you own or rent;

**(2)** A "watercraft" you do not own that is:

  **(a)** Less than 55 feet long; and

  **(b)** Not being used to carry persons or property for a charge; or

**(3)** Liability assumed under an "insured contract" for the ownership, maintenance or use of "watercraft."

**h. Aircraft**

The ownership, maintenance, operation, use, entrustment to others or "loading or unloading" of any "aircraft":

**(1)** Owned by an insured; or

**(2)** Chartered without crew by an insured or on an insured's behalf.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "incident" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any "aircraft" that is owned or operated by or rented or loaned to any insured.

**i. War**

Any liability arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.   Damage to your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage to you Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.   Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.   Recall of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)**   "Your product";

**(2)**   "Your work"; or

**(3)**   "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.   E.R.I.S.A.**

Liability for alleged or actual violations of the Employees Retirement Income Security Act of 1974 or any amendments or additions thereto.

**p.   Directors and Officers**

Liability for a wrongful act, error, omission or breach of duty by an insured in the performance of the office of director or officer of an organization.

**q.   Uninsured/Underinsured Motorist and Similar Laws**

Liability imposed on the insured under an uninsured/underinsured motorist law, a personal injury protection law, a reparations benefit law or other similar law.

**r.   Electronic Data**

Any liability arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data."

**s.   Nonemployment Related Discrimination**

To any alleged or actual nonemployment related discrimination committed intentionally against a person.

**t.   Asbestos**

**(1)**   "Bodily Injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened exposure at any time to "asbestos"; or

**(2)**   Any loss, cost or expense that may be awarded or incurred:

**(a)**   By reason of a claim or "suit" for any such injury or damage; or

**(b)**   In complying with a governmental direction or request to test for, monitor, clean up, remove, contain or dispose of "asbestos."

**u.   Fungi and Microbes**

**(1)**   "Bodily injury," "property damage" or "personal and advertising injury," which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi or microbes"; or

**(2)**   Any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assessing the effects of "fungi or microbes" by any insured or by anyone else.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense.

**v.   Silica**

**(1)**   "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica;" or

**(2)** "Personal and advertising injury" or "property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica."

**w.** **Named Insured vs. Named Insured**

Any liability arising out of claims or "suits" by a named insured against another named insured.

**x.** **Employment Related Practices**

Any liability arising out of:

**(1)** A refusal to employ;

**(2)** Termination of employment;

**(3)** Demotion, evaluation, reassignment, discipline;

**(4)** Coercion, defamation, discrimination, harassment or humiliation; or

any other employment related practices, policies, acts or omissions.

**y.** **Terrorism Limitation**

"Bodily injury" or "property damage" arising out of any act of terrorism, unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

**z.** **Liquor Liability Limitation**

"Bodily injury" or "property damage" for which an insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

**aa.** **Auto and Mobile Equipment Limitation**

Any liability arising out of the:

**(1)** Ownership;

**(2)** Maintenance;

**(3)** Use; or

**(4)** Entrustment to others

of an "automobile" or "mobile equipment" owned or operated by or rented or loaned to an insured unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

To the extent that this insurance applies to an "automobile" or "mobile equipment" it is further subject to the pollution exclusion, exclusion **f.** of this policy.

Use includes operation or "loading or unloading."

**bb.** **Do Not Call**

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or the CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**SECTION II – WHO IS AN INSURED**

**1.** Named Insured means any individual or organization stated in the Declarations of this policy and if you are designated in the Declarations of this policy as:

**a.** An individual, you and your spouse, but only with respect to the conduct of a business of which you are the sole owner.

If you are designated in the Declarations of this policy as an individual, this policy shall not apply to liability arising out of your domestic or non-business activities. This does not apply to the ownership, maintenance, use or "loading or unloading" of any "automobile," or to the Personal Umbrella Liability Coverage Part.

**b.** A partnership or joint venture, you and your members, your partners, and their spouses, but only with respect to the conduct of your business.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**c.** An organization other than a partnership or joint venture, you and your executive officers and directors, but only with respect to their duties as your officers or directors. Your stockholders are also named insureds, but only with respect to their liability as stockholders.

**d.** A limited liability company, you and your members, but only with respect to the conduct of your business. Your managers are also named insureds but only with respect to their duties as your managers.



No person or organization is an insured with respect to the conduct of any current or past limited liability company that is not shown as a Named Insured in the Declarations.

**e.** A corporation or organization, other than partnerships, joint ventures or limited liability companies, that you form, acquire or gain control of during the policy period, but only with respect to "bodily injury," "property damage" or "personal and advertising injury" taking place after you form, acquire or gain control of such corporation or organization.

**2.** Insured means the Named Insured and:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your employees, other than your executive officers and directors (if you are an organization other than a partnership, joint venture or limited liability company) or your members (if you are a limited liability company ) but only for acts within the scope of their employment by you or while performing duties related to the conduct or your business. However, none of these employees or "volunteer workers" is an insured for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you; to your partners or members (if you are a partnership or joint venture) to your members (if you are a limited liability company) or to a co-employee while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-employee or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a) or (b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control or, or over which physical control is being exercised for any purpose by

you, any of your employees, "volunteer workers" any partner or member (if you are a partnership or joint venture) or any member (if you are a limited liability company).

**b.** A person or organization for whom you are required, by virtue of a written contract entered into prior to the "bodily injury," "property damage" or "personal and advertising injury" occurring or being committed, to provide the insurance that is afforded by this policy. This insurance applies only with respect to operations by you or on your behalf or to facilities you own or use, but only to the extent of the limits of insurance required by such contract, not to exceed the limits of insurance in this policy.

**c.** Any other persons or organizations included as an insured under the provisions of the "scheduled underlying insurance" shown in the Declarations of this policy and then only for the same coverage, except for limits of insurance, afforded under such "scheduled underlying insurance."

However, If a blanket additional insured endorsement is attached to the general liability "scheduled underlying insurance" pursuant to a written or oral contract or agreement between you and another person or organization (called additional insured), this insurance is excess over such insurance provided to the additional insured subject to the following conditions:

**(1)** If the limits specified in the written contract or agreement are less than the limits provided by the "scheduled underlying insurance," then no coverage is provided to the additional insured under this policy.

**(2)** If the limits specified in the written contract or agreement are greater than the limits provided by the "scheduled underlying insurance," then this insurance is excess over the insurance provided by the "scheduled underlying insurance." The limits of insurance for the additional insured are the lesser of:

**(i)** The limits specified in the written contract; or

**(ii)** The limits of the "scheduled underlying insurance" plus the limits of this policy.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought;

**c.** Persons or organizations making claims or bringing "suits."

d. "Automobiles," "aircraft" or "watercraft" to which this policy applies; or

e. Coverages under which loss is insured in this policy.

2. The limit of insurance shown in the Declarations as the Aggregate Limit is the most we will pay for the sum of all "ultimate net loss," to which this insurance applies and applies separately to all "ultimate net loss":

a. Included in the "products-completed operations hazard";

b. To which, and in the same manner, an aggregate limit applies under "scheduled underlying insurance" other than "ultimate net loss" included in the "products-competed operations hazard"; and

c. To which no "scheduled underlying insurance" applies.

The Aggregate Limit does not apply to "ultimate net loss" for which no aggregate limit applies in the "scheduled underlying insurance."

3. Subject to 2. above, the limit of insurance shown in the Declarations as the Each Incident limit is the most we will pay for the sum of all "ultimate net loss" to which this insurance applies arising arising out of any one "incident."

4. In the event of reduction or exhaustion of the aggregate limits of insurance under "scheduled underlying insurance" solely by reason of payments of a combination of covered:

a. Expenses;

b. Settlements; or

c. Judgments

paid thereunder as a result of "bodily injury," property damage" or "personal and advertising injury" taking place during this policy period, this policy shall, subject to this limit of insurance provision and to the remaining terms and provisions and conditions of this policy:

a. Apply in excess of such reduction of "scheduled underlying insurance"; or

b. Apply in place of the exhausted amount of "scheduled underlying insurance."

Nothing in a. or b. above shall serve to increase the limits of insurance shown in the Declarations.

5. The limits of this policy shall apply separately to:

a. Each consecutive annual period; and

b. Remaining periods of less than 12 months;

starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.

**SECTION IV – CONDITIONS**

1. **Financial Impairment**

Bankruptcy, rehabilitation, receivership, liquidation or other financial impairment of you or an "underlying insurer" shall neither relieve nor increase any of our obligations under this policy.

In the event there is diminished recovery or no recovery available to you as a result of such financial impairment of an insurer providing "scheduled underlying insurance," the coverage under this policy shall apply only in excess of the limits of insurance stated in the "scheduled underlying insurance." Under no circumstances shall we be required to drop down and replace the limits of insurance, or assume the obligations of a financially impaired insurer.

2. **Duties of the Insured**

a. In the event of an "incident" which has not resulted in a claim or suit.

Whenever you have information of an "incident" which involves injuries or damages likely to involve this policy, written notice shall be given by or for you to us or to our authorized agent as soon as practicable. The notice shall contain:

(1) Particular information sufficient to identify the insured;

(2) Such information as can be reasonably obtained with respect to time, place and circumstances of the occurrence or offense; and

(3) Names and addresses of the insured and of available witnesses.

b. In the Event of Claims or Suit

You shall provide us with written notice as soon as practicable whenever:

(1) A claim is made or "suit" is brought against you;

(2) You receive notice that a right to bring claim or "suit" against you will be asserted; or

(3) You obtain information that the obligation of "underlying insurers" to:

(a) Investigate;

(b) Defend;

(c) Pay on behalf of; or

(d) Indemnify

you has ceased.

Every demand, notice, summons, amended complaint or other process received by you or your representative shall be forwarded with each notice.

**3. Legal Action Against Us**

No legal action shall be brought against us unless you have fully complied with all the terms of this policy and the amount of your obligation to pay has been finally determined either by:

**a.** Judgment against you after actual trial; or

**b.** Written agreement between us, you and the claimant.

**4. Other Insurance**

This insurance is excess over and will not contribute with any other insurance available to the insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise. This condition does not apply to insurance purchased specifically to apply in excess of this insurance.

**5. Premium Audit**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** If the premium is shown in the Declarations as flat, the premium for this policy is not subject to adjustment.

**c.** If the premium is shown in the Declarations as adjustable, the premium shown as the advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured shown in the Declarations. If the sum of the advance and audit premiums paid for the policy term are greater than the earned premium, we will return the excess, subject to the minimum premium, to the first Named Insured shown in the Declarations.

**d.** The first Named Insured shown in the Declarations must keep records of the information we need for premium computation, and send us copies at such times as we request.

**6. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**7. Severability of Interests**

The insurance afforded applies separately to each insured against whom claim is made or "suit" is brought. However, the inclusion of more than one insured shall not operate to increase the limits of insurance.

**8. Annual Rating**

If this policy is issued for a period in excess of one year, the premium may be revised on each annual anniversary in accordance with our rates and rules in effect at that time.

**9. "Scheduled Underlying Insurance"**

Material change in premium for "scheduled underlying insurance" shall be promptly reported to us. Premium for this policy may be adjusted to reflect changes in underlying insurance in accordance with our manuals in effect at the time of the change.

**10. Maintenance of "Scheduled Underlying Insurance"**

While this policy is in force you agree that the policies listed in the Declarations as "scheduled underlying insurance" and their renewals and replacements shall be maintained, without alterations of terms or conditions, in full effect during the term of this policy; except for reduction or exhaustion of the aggregate limits of insurance in the "scheduled underlying insurance," provided that such reduction or exhaustion is solely the result of "incidents" taking place during this policy period, and not before. If you fail to maintain "scheduled underlying insurance," this condition shall not invalidate this policy. However, in the event of such failure, we will only be liable to the same extent as if you had complied with this condition.

**11. Appeals**

If you or your "underlying insurers" elect not to appeal a judgment in excess of the limits of insurance afforded by the:

**a.** "Scheduled underlying insurance";

**b.** "Unscheduled underlying insurance"; or

**c.** "Retained limit";

we may elect to appeal. Our limit of liability shall not be increased because of such appeal. We will, however, pay the following costs and expenses:

**a.** All premium bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy;

**b.** All premiums on appeal bonds required in such defended "suit," but without obligation to apply for or furnish such bonds;

**c.** Court fees;

**d.** Costs and expenses taxed against you by the appellate court and interest accruing after entry of a judgment against you and before we have:

**(1)** Paid;

**(2)** Offered to pay; or

**(3)** Deposited in court

the part of the judgment that is within the applicable limit of insurance. Where the "underlying insurers" terminate their liability to pay interest on the judgment by an offer to pay their limits, you shall demand that such limits be paid. If the appeal is successful, such amounts not obligated to be paid shall be returned to such "underlying insurer."

## 12. Subrogation

In the case of any payments by us under the coverages of this policy, we shall be subrogated to all rights of recovery against any other party which you may have and will cooperate with you and all other interests. Amounts recovered shall be apportioned in the following order:

**a.** Amounts paid in excess of the payments under this policy shall first be reimbursed up to the amount paid by those, including you, who made such payments;

**b.** We are then to be reimbursed up to the amount we paid;

**c.** Any remainder shall be available to the interests of those over whom this coverage is in excess and who are entitled to claim such remainder.

Expenses necessary to the recovery of such amounts shall be divided between the interests concerned, including you, in the ratio of their respective recoveries as finally settled.

## 13. Settlement of Claims or Suit

We may pay, but are not obligated to pay, any part or all of the amount of the "retained limit" to effect settlement of a claim or "suit." Upon notification of the action taken you shall promptly reimburse us for such part of the "retained limit" that we had paid. All named insureds are jointly and severally responsible for our reimbursement and agree to make such reimbursement within 30 days after we give you written notice or demand for payment.

## 14. Sole Agent

The insured first named in the Declarations is authorized to act on behalf of all named insureds and other insureds with respect to:

**a.** The giving and receiving of notice of cancellation; and

**b.** Receiving return premium that may be payable under this policy.

The insured first named in the Declarations is responsible for the payment of premiums, but the other named Insureds jointly and severally agree to make

such payments in full if the insured first named fails to pay the amount due within 30 days after we give written notice or demand.

## 15. Trade Sanctions

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void ab initio (void from its inception) with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

**a.** Any insured, or any person or entity claiming the benefits of an insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

**b.** Any claim or "suit" that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or "suit" is prohibited by U.S. economic or trade sanctions;

**c.** Any claim or "suit" that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

**d.** Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

**e.** Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this policy a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this policy a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

## SECTION V – DEFINITIONS

**1.** **"Advertisement"** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding websites, only that part of a website that is about your goods or services for the purposes of attracting customers or supporters is considered an advertisement.

2. **"Automobile"** means

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads; including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "automobile" does not include "mobile equipment."

3. **"Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death, humiliation, shock, mental anguish or mental injury by that person at any time which results as a consequence of the bodily injury, sickness or disease.

4. **"Aircraft"** means a vehicle designed to transport persons or property in the air.

5. **"Impaired property"** means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

6. **"Insured contract"** means:

a. A lease of premises;

b. A sidetrack agreement;

c. An easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An indemnification of a municipality as required by ordinance, except in connection with work for a municipality;

e. An elevator maintenance agreement; or

f. The part of other contracts or agreements pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability to pay damages because of "bodily injury" or "property damage" to a third person or organization, if the contracts or agreements are made prior to the "bodily injury" or "property damage."

Tort liability means liability that would be imposed by law in the absence of contracts or agreements.

An "insured contract" does not include that part of a contract or agreement:

a. That indemnifies an architect, engineer or surveyor for an injury or damages arising out of:

(1) Preparing, approving or failing to prepare or approve:

(a) Maps;

(b) Drawings;

(c) Opinions;

(d) Reports;

(e) Surveys;

(f) Change orders;

(g) Designs; or

(h) Specifications; or

(2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

b. Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **a.(1)** above and supervisory, inspection or engineering services; or

c. That indemnifies a person or organization for damage by fire to premises rented or loaned to an insured.

7. **"Loading or unloading"** means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "watercraft" or "automobile";

b. While it is in or on an "aircraft," "watercraft" or "automobile"; or

c. While it is being moved from an "aircraft," "watercraft" or "automobile" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the "aircraft," "watercraft" or "automobile."

8. **"Mobile equipment"** means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** Vehicles that travel on crawler treads;

   **c.** Vehicles maintained for use solely on or next to premises you own or rent;

   **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

   **e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

   **f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following type of permanently attached equipment are not "mobile equipment" but will be considered "automobiles":

   **(1)** Equipment designed primarily for:

   **(a)** Snow removal ;

   **(b)** Road maintenance, but not construction or resurfacing; or

   **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on "automobiles" or truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

   However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "automobiles"

9. **"Incident"**

   **a.** With respect to "bodily injury" and "property damage," "incident" means an occurrence. An occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

   **b.** With respect to "personal and advertising injury," "incident" means an offense arising out of your business.

10. **"Personal and Advertising Injury"** means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution or abuse of process;

   **c.** Wrongful eviction from, wrongful entry into, or the invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

   **d.** Discrimination, unless such insurance is prohibited by law;

   **e.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **f.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **g.** The use of another's advertising idea in your "advertisement;"

   **h.** Infringing upon another's copyright, trade dress or slogan in your "advertisement."

11. **a.** **"Products-completed operations hazard"** includes "bodily injury" and "property damage" occurring away from premises an insured owns or rents and arising out of "your product" or "your work" except:

   **(1)** Products in your physical possession; or

   **(2)** Work not yet completed or abandoned.

   **b.** "Your work" will be deemed completed at the earliest of the following:

   **(1)** When all work called for in the "insured contract" has been completed;

   **(2)** When all of the work to be done at the site has been completed if the "insured's contract" calls for work at more than one site; or

**(3)** When that part of the work done at a job site has been put to its intended use by a person or organization other than another contractor or subcontractor working on the same project. Work that may need:

**(a)** Service;

**(b)** Maintenance;

**(c)** Correction;

**(d)** Repair; or

**(e)** Replacement;

but which is otherwise complete, will be treated as completed.

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it; or

**(2)** The existence of:

**(a)** Tools;

**(b)** Uninstalled equipment; or

**(c)** Abandoned or unused materials.

**12.** **"Property damage"** means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the occurrence that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

**13.** **"Suit"** means a civil proceeding in which damages because of:

**a.** "Bodily injury";

**b.** "Property damage"; or

**c.** "Personal and advertising injury";

to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding alleging such damages to which you must submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**14.** **"Your product"** means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes warranties or representations made with respect to the fitness, quality, durability, performance or use of "your product" and the providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**15.** **"Your work"** means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes warranties or representations made with respect to the fitness, quality, durability, performance or use of "your work" and the providing of or failure to provide warnings or instructions.

**16.** **"Retained limit"** means the amount stated as such in the Declarations. The "retained limit" is retained and payable by the insured as respects all "incidents" not covered by "scheduled underlying insurance" or by "unscheduled underlying insurance."

**17.** **"Scheduled underlying insurance"** means the insurance policies listed in the Schedule of Underlying Insurance including renewal or replacement of such contracts which are not more restrictive than those listed in the aforementioned Schedule of Underlying Insurance.

**18.** **"Ultimate net loss"**

**a.** "Ultimate net loss" means the actual damages the insured is legally obligated to pay, either through:

**(1)** Final adjudication on the merits; or

**(2)** Through compromise settlement with our written consent or direction;

because of "incident(s)" covered by this policy.

However, it includes the above mentioned sums only after deducting all other recoveries and salvages.

**b.** "Ultimate net loss" does not include the following:

**(1)** Costs or expenses related to:

**(a)** Litigation,

**(b)** Settlement;

**(c)** Adjustment; or

**(d)** Appeals;

nor costs or expenses incident to the same which an "underlying insurer" has paid, incurred or is obligated to pay to or on behalf of the insured;

**(2)** Pre-judgment interest;

**(3)** Office costs and expenses and salaries and expenses of the employees of an insured;

**(4)** Our office costs and expenses and salaries of our employees; or

**(5)** General retainer and/or monitoring fees of counsel retained by the insured.

**19.** **"Underlying insurer"** means an insurer whose policy covers "bodily injury," "property damage" or "personal and advertising injury" also covered by this policy but does not include insurers whose policies were purchased specifically to be in excess of this policy. It includes all insurers providing:

**a.** "Unscheduled underlying insurance"; and

**b.** "Scheduled underlying insurance."

**20.** **"Unscheduled underlying insurance"**

**a.** "Unscheduled underlying insurance" means insurance policies available to an insured, whether:

**(1)** Primary;

**(2)** Excess;

**(3)** Excess-contingent; or

**(4)** Otherwise;

except the policies listed in the Schedule of Underlying Insurance.

**b.** "Unscheduled underlying insurance" does not include insurance purchased specifically to be excess of this policy.

**21.** **"Watercraft"** means a vehicle designed to transport persons or property in or on water.

**22.** **"Authorized Insured"** means any named insured or any employee authorized by a named insured to give or receive notice of a claim or "suit."

**23.** **"Electronic data"** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including

systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**24.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**25.** **"Fungi or microbes"** means:

**a.** Any form of fungus, yeast, mold, mildew, or mushroom, including mycotoxins, spores, scents, byproducts or other substances produced or released by fungi; and

**b.** Any bacteria, virus, or any other non-fungal, single celled or colony-form organism, including any toxins, scents, byproducts or other substances it produces or releases, whose injurious source is in or on a building or its contents.

But "fungi and microbes" does not include fungi that were deliberately grown for human consumption, microbes that were transmitted directly from person to person, or microbes that caused food poisoning, if your business is food processing, sales, or serving.

**26.** **"Silica"** means the chemical compound silicon dioxide (SiO2) in any form, including dust which contains "silica."

**27.** **"Asbestos"** means the mineral in any form whether or not the asbestos was at any time:

**a.** Airborne as a fiber, particle or dust;

**b.** Contained in or formed a part of a product, structure or other real or personal property;

**c.** Carried on clothing;

**d.** Inhaled or ingested; or

**e.** Transmitted by any other means.

**28.** **"Volunteer worker"** means a person who is not your employee, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**SECTION VI – DEFENSE PAYMENT AND RELATED DUTIES**

**1.** If a claim or "suit" alleges damages covered by underlying policies and the obligation of all "underlying insurers" either to:

**a.** Investigate and defend the insured; or

**b.** Pay the cost of such investigation and defense;

ceases solely through exhaustion of all underlying limits of insurance through payment of a combination

4020003260117956328645

of covered expenses, settlements or judgments for "bodily injury," "property damage" or "personal and advertising injury" taking place during our policy period, then we will either:

**a.** Assume the investigation and defense of the insured against "suits" seeking damages; or

**b.** If we elect not to assume the investigation and defense in **1.a.** above, we will reimburse the insured for reasonable defense costs and expenses incurred with our written consent. However, such reimbursement excludes:

**(1)** Office expenses of the insured;

**(2)** Salaries and expenses of employees; and

**(3)** General retainer fees of counsel retained by the insured.

**2.** We will investigate and defend an insured or reimburse an insured for "suits" brought against an insured for a claim or "suit" that alleges damages because of "bodily injury," "property damage" or "personal and advertising injury" not covered under:

**a.** "Scheduled underlying insurance"; and

**b.** "Unscheduled underlying insurance";

but which seeks damages because of "bodily injury," "property damage" or "personal and advertising injury" otherwise covered under this policy. Costs and expanses of such investigation and defense are not subject to the "retained limit."

**3.** We will investigate and defend an insured or reimburse an insured for such costs of investigation and defense described in either **1.** or **2.** above, even if the allegations of a "suit" are:

**a.** Groundless;

**b.** False; or

**c.** Fraudulent;

but only until we make payment or offer to pay or deposit in court that part of judgment(s) not exceeding our limit of insurance.

**4.** We shall also have the sole right to make settlement of a "suit" as we deem expedient.

**5.** If not permitted by law or otherwise to perform these duties, we will pay an insured for defense costs and expenses incurred with our prior written consent.

**6.** Amounts we pay or incur pursuant to the obligation to defend or pay the costs and expenses of defense are in addition to, and not subject to, the limits of insurance stated in the Declarations.

**7.** In addition to our limits of insurance, we will pay prejudgment interest awarded against an insured on that part of a judgment covered by this policy. We will

not pay prejudgment interest on that period of time after we offer to pay:

**a.** Our limit of insurance; or

**b.** That portion of our limit of insurance which equals the amount of a settlement demand when combined with the limits of "underlying insurers."

**8.** We will pay interest on a judgment that accrues after entry of that judgment, but before we have:

**a.** Paid;

**b.** Offered to pay; or

**c.** Deposited in court

that part of the judgment that is within the limit of insurance of this policy. The amount of interest we pay will be in direct proportion that amount we pay as damages bears to the total amount of judgment. We will not pay additional interest that accrues after we have:

**a.** Paid;

**b.** Offered to pay;

**c.** Deposited in court

that part of the judgment that is within the limit of insurance of this policy.

**9.** We will pay all reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit." This includes actual loss of earnings up to liability $250. a day because of time off from work.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

It is agreed that:

**I.** This policy does not apply:

**A.** Under Liability Coverage to "bodily injury" "personal and advertising injury" or "property damage"

**1.** With respect to which an insured under this policy, is also an insured under a nuclear energy liability policy issued by the:

**a.** Nuclear Energy Liability Insurance Association;

**b.** Mutual Atomic Energy Liability Underwriters; or

**c.** Nuclear Insurance Association of Canada;

or any of their successors, or would be an insured under any such policy but for its

termination upon exhaustion of its limit of liability; or

2. Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

   a. Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law or amendment thereof; or

   b. The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material," and arising out of the operation of a "nuclear facility" by any person or organization.

C. Under any Liability Coverage, to "bodily injury" "personal and advertising injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

   1. The "nuclear material":

      a. Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

      b. Has been discharged or dispersed therefrom;

   2. The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   3. The "bodily injury," "personal and advertising injury," or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the:

      a. Planning;

      b. Construction;

      c. Maintenance;

      d. Operation; or

      e. Use of

   any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(C.3.)** applies only to "property damage" to such "nuclear facility" and any property threat.

II. As used in this endorsement:

A. "Hazardous properties" include radioactive, toxic or explosive properties.

B. "Nuclear material" means "source material," "special nuclear material" or "byproduct material."

C. "Source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

D. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

E. "Waste" means waste material:

   1. Containing "by-product material" other than the tailings or waste produced by the extraction or concentration of uranium or thorium from ore processed primarily for its "source material" content; and

   2. Resulting from the operation by any person or organization, of a "nuclear facility" included within paragraphs **1.** and **2.** of the definition of "nuclear facility."

F. "Nuclear facility" means:

   1. Any "nuclear reactor";

   2. Any equipment or device designed or used for:

      a. Separating the isotopes of uranium or plutonium;

      b. Processing or utilizing "spent fuel"; or

      c. handling, processing or packaging "waste";

   3. Any equipment or device used for the processing, fabricating or alloying of special "nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment is located consists of or contains more than:

      a. 25 grams of plutonium or uranium 233 or any combination thereof; or

      b. 250 grams of uranium 235;

   4. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

40020003260117956328646

**G.** "Nuclear reactor" means an apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**H.** "Property damage" includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTOR LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

**I.** The following paragraphs are added to SECTION **I – COVERAGES, 2. Exclusions:**

This insurance does not apply:

1. to "bodily injury," "property damage," or "personal and advertising injury" arising out of the rendering of or failure to render any "professional services" by or on behalf of any insured;

2. to "bodily injury," "property damage," or "personal and advertising injury" arising out of any operation performed by or on behalf of any insured which is or was insured under an Owner Controlled Insurance Program (O.C.I.P.), or Contractor Controlled Insurance Program (C.C.I.P.), otherwise referred to as a wrap-up;

3. to "bodily injury," "property damage," or "personal and advertising injury" arising out of the design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction, or replacement, of an "exterior insulation and finishing system" (EIFS) or any part thereof, or any substantially similar system or any part thereof, by or on behalf of any insured;

4. to "property damage" arising out of the "explosion hazard," the "collapse hazard" or the "underground property damage hazard;"

5. to "bodily injury," "property damage" or "personal and advertising injury" arising out of the "subsidence" of land;

6. to "bodily injury," "property damage" or "personal and advertising injury" arising out of "your work" on any "residential structure."

Paragraphs **3., 4., 5.,** and **6.** of this exclusion do not apply if such "bodily injury," "property damage" or "personal injury and advertising injury" is covered by "scheduled underlying insurance."

**II.** The following definitions are added to SECTION **V – DEFINITIONS:**

"Collapse hazard" includes "structural property damage" and any resulting "property damage" to any other property at any time.

"Explosion hazard" includes "property damage" arising out of blasting or explosion. The "explosion hazard" does not include "property damage" arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment.

"Exterior insulation and finishing system" (EIFS) means an exterior wall cladding system consisting of an insulation material attached to a substrate, a base coat on the surface of the insulation material, and a protective finish applied to the base coat and any accessories thereto, including but not limited to conditioners, primers, accessories, flashings, coatings, caulking or sealants.

"Professional services" means the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications, or supervisory or inspection activities performed as part of any architectural, engineering or surveying activities. "Professional services" do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

"Residential structure" means a structure where 30% or more of the square footage area is used or intended to be used for human habitation.

"Structural property damage" means the collapse of or structural injury to any building or structure due to:

1. Grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work; or

2. Moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support of that building or structure.

"Subsidence" means earth movement including but not limited to:

    **a.** Landslide;

    **b.** Mudflow;

    **c.** Earth sinking;

    **d.** Earth rising;

    **e.** Collapse or movement of fill;

    **f.** Earth settling, slipping, falling away, caving in, eroding or tilting;

    **g.** Earthquake; or

    **h.** Any other movement of land or earth.



"Underground property damage hazard" includes "underground property damage" and any resulting "property damage" to any other property at any time.

"Underground property damage" means "property damage" to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, or any apparatus used with them, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLLUTION EXCLUSION AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

**Exclusion f.** of **SECTION I – COVERAGES** is deleted in its entirety, and is replaced by the following:

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

(e) That are, or that are contained in property that is:

(i) Being transported or towed by, or handled for movement into, onto or from a covered "automobile";

(ii) Otherwise in the course of transit;

(iii) Being stored, disposed of, treated or processed in or upon the covered "automobile";

(f) Before the "pollutants" or property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "automobile"; or

(g) After the "pollutants" or property in which the "pollutants" are contained are moved from the covered "automobile" to the place where they are finally:

(i) Delivered;

(ii) Disposed of; or

(iii) Abandoned

by the insured.

Subparagraph **(a)** does not apply to "bodily injury" if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originating from equipment that is used to heat, cool, or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Subparagraph **(d)(i)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants, or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraph **(e)(iii)** does not apply to fuels, lubricants, fluids, exhaust, gases or other similar "pollutants" that are needed for or



G-300912-A
(Ed. 02/10)

result from the normal electrical, hydraulic or mechanical functioning of the covered "automobile" or its parts if the "pollutants" escape or are discharged, dispersed or released directly from an "automobile" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants."

Subparagraphs **(f)** and **(g)** do not apply if the "pollutants" or property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "automobile" and the discharge, dispersal, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**(2)** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(3)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

All other terms, conditions and exclusions of this policy remain unchanged.

**CNA**

G-300982-A
(Ed. 07/10)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

### SCHEDULE

**Crisis Management Expense Aggregate Limit:** $250,000 per policy period.

Solely with respect to the Crisis Management Coverage provided by this endorsement, the following changes apply to the Commercial Umbrella Plus Coverage Part.

**A.** The following paragraph is added to **SECTION I – COVERAGES, 1. Insuring Agreement:**

**e.** When this policy applies to an "incident" that causes "serious bodily injury or property damage," we will reimburse you for "eligible crisis management expense" you incur and report to us within six months of the "incident."

**B.** The following changes are made to **SECTION III – LIMITS OF INSURANCE:**

**1.** Paragraph **2.** is deleted in its entirety and replaced with the following;

The limit of insurance shown in the Declarations as the Aggregate Limit is the most we will pay for the sum of all "ultimate net loss" and "eligible crisis management expense" to which this insurance applies. This Aggregate Limit applies separately to all "ultimate net loss":

**a.** Included in the "products-completed operations hazard";

**b.** To which, and in the same manner, an aggregate limit under "scheduled underlying insurance" other than "ultimate net loss" included in the "products-completed operations hazard"; and

**c.** To which no "scheduled underlying insurance" applies

and includes any associated "eligible crisis management expense."

The Crisis Management Expense Aggregate Limit listed in the Schedule above is included within and is not in addition to the Aggregate Limit of this policy.

**2.** The following paragraph is added:

**6.** Subject to **2.** above, the Crisis Management Expense Aggregate Limit stated in the Schedule is the most we will pay for the sum

of all "eligible crisis management expense" to which this insuring applies.

**C.** The following definitions are added to **SECTION V – DEFINITIONS:**

**1.** "Serious bodily injury or property damage" means injury to three or more people resulting in death, permanent disfigurement, or the permanent loss or impairment of a bodily function, body part or organ. "Serious bodily injury or property damage" also means "property damage" to which this insurance applies.

**2.** "Eligible crisis management expense" means reasonable and necessary expenses incurred by a crisis management firm that you hire to provide media management services for the purpose of maintaining and restoring public confidence in you.

But "eligible crisis management expense" does not mean any of the following:

**a.** Salary, wages, or benefits of you, your employees or your temporary workers;

**b.** Costs to acquire, repair or replace real or personal property;

**c.** Your loss of business income;

**d.** Your expense to hire a public adjuster or appraiser or any other claim adjustment expenses incurred by you; and

**e.** "Bodily injury," "property damage," "personal and advertising injury," or any expense or other coverage this policy provides, other than this **CRISIS MANAGEMENT COVERAGE ENDORSEMENT.**

All other terms, conditions and exclusions of this policy remain unchanged.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KEY EMPLOYEE REPLACEMENT EXPENSE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

## SCHEDULE

**Limit of Insurance:**  $100,000 per Key Employee

**Key Employee Replacement Expense Coverage Aggregate Limit:**  $100,000 per policy period.

Solely with respect to the Key Employment Replacement Expense Coverage provided by this endorsement, the following changes apply to the Commercial Umbrella Plus Coverage Part.

**I.**   The following paragraphs are added to **SECTION I – COVERAGES, 1. Insuring Agreement**:

**f.**   We will reimburse you for the actual and necessary "Key Employee Replacement Expense" you incur due to your permanent loss of the services of a "Key Employee" caused by a "covered accident" and reported to us within six months of the "covered accident."

Insurance under this endorsement applies only if the "covered accident" occurs while your policy is in effect. But the period of time for which we will pay expenses covered under this endorsement will not be limited by the expiration of your policy.

Insurance under this endorsement does not apply to:

**1.**   The death or permanent disability of a "Key Employee" relating to, or arising out of:

**a.**   War and Military Action, meaning:

**(1)**   War, including undeclared or civil war;

**(2)**   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)**   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in defending against any of these;

**b.**   Nuclear reaction or radiation or radioactive contamination, however caused;

**c.**   Sickness or disease, including metal illness or mental injury;

**d.**   Pregnancy, childbirth, miscarriage or abortion;

**e.**   Suicide, attempted suicide or self inflicted bodily injury, while sane or insane;

**f.**   Any accident while the "Key Employee" was driving while intoxicated, impaired, or other wise under the influence of alcohol; or

**g.**   Taking illegally obtained drugs.

**2.**   Any expenses you incur which you would not have incurred if you had used all reasonable means to:

**a.**   Find a permanent replacement for the "Key Employee"; and

**b.**   Reduce or discontinue the "Key Employee Replacement Expense";

as soon as possible after your permanent loss of the services of the "Key Employee" caused by a "covered accident."

Insurance under this endorsement includes the reasonable extra expense you incur to minimize the amount of "Key Employee Replacement Expense," but only to the extent the amount of "Key Employee Replacement Expense" otherwise payable under this endorsement is reduced.

**3.**   Any additional expenses incurred due to your loss of the services of a permanent replacement employee appointed or hired to replace a "Key Employee," however caused. But this exclusion does not apply if the replacement employee is included in the definition as a "Key Employee" and your loss of the services of the replacement employee is caused by a "covered accident."

The amount of "Key Employee Replacement Expense" will be determined based on:

**1.**   The actual and necessary expenses covered under this endorsement which you incur to find, to appoint or hire and to train a permanent replacement for the "Key Employee" and to continue the performance of the "Key Employee's" normal job responsibilities while a permanent replacement is being sought, appointed or hired,

Copyright 2010, CNA Financial Corporation

and trained. We will deduct from the total of such expenses:

**a.** Any expenses which would have been incurred by you for the "Key Employee" if you had not lost the services of the "Key Employee"; and

**b.** Any "Key Employee Replacement Expense" that is paid for by any other insurance.

**2.** Necessary expenses that reduce the "Key Employee Replacement Expense" that otherwise would have been incurred.

**II.** The following changes are made to **SECTION III – LIMITS OF INSURANCE**:

**A.** Paragraph **2.** is deleted in its entirety and replaced with the following:

**2.** The limit of insurance shown in the Declarations as the Aggregate Limit is the most we will pay for the sum of all "ultimate net loss," to which this insurance applies and applies separately to all "ultimate net loss":

**a.** Included in the "products-completed operations hazard";

**b.** To which, and in the same manner, an aggregate limit applies under "scheduled underlying insurance" other than "ultimate net loss" included in the "products-competed operations hazard"; and

**c.** To which no "scheduled underlying insurance" applies.

The most we will pay for "Key Employee Replacement Expense" due to your loss of the services of any one "Key Employee" is the applicable Limit of Insurance shown in the Schedule for the "Key Employee." The amount payable under this endorsement is not subject to the "retained limit."

The limit of insurance shown in the Schedule above as the Key Employee Replacement Expense Coverage Aggregate Limit is the most we will pay for the sum of all "Key Employee Replacement Expense" to which this insurance applies.   This Key Employee Replacement Expense Coverage Aggregate Limit listed in the Schedule above is included within and is not in addition to the Aggregate Limit of this policy.

The Aggregate Limit does not apply to "ultimate net loss" for which no aggregate limit applies in the "scheduled underlying insurance."

**B.** Paragraph **3.** is deleted in its entirety and replaced with the following:

**3.** Subject to **2.** above, the limit of insurance shown in the Declarations as the Each Incident limit is the most we will pay for the sum of all "ultimate net loss" and all "Key Employee Replacement Expense" to which this insurance applies arising out of any one "incident."

**III.** The following definitions are added to **SECTION V – DEFINITIONS**:

**B.** "Key Employee Replacement Expense" as used in this endorsement means the necessary expenses you incur that you would not have incurred if you had not lost the services of the "Key Employee":

**1.** To continue the performance of the "Key Employee's" normal job responsibilities, with comparable quality, while a permanent replacement for the "Key Employee" is being sought, appointed or hired, and trained. Insurance under this endorsement for these expenses will apply for the period of time beginning on the date of your permanent loss of the services of the "Key Employee" caused by a "covered accident," and ending 60 days after the date a permanent replacement for the Key Employee is appointed or hired, subject to a maximum period of 180 days.

**2.** To find a qualified permanent replacement to fill the "Key Employee's" position described in the Schedule, meaning the normal and reasonable:

**a.** Costs of advertising the employment position opening;

**b.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

**c.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references the job applicants and legal expenses incurred to draw up employment contracts.

Insurance under this endorsement for these expenses will apply for the period of time beginning on the date of your permanent loss of the services of the "Key Employee" caused by a "covered accident," and ending on the date a permanent replacement for the "Key Employee" is appointed or hired, subject to a maximum period of 180 days.

**3.** To appoint or hire and to train a permanent replacement for the "Key Employee," meaning the normal and reasonable:

4O20000260117956328650

Copyright 2010, CNA Financial Corporation

a. Expenses you incur to relocate the replacement employee to an area within a reasonable commute from the applicable employment location described in the Schedule;

b. First year amounts of the replacement employee's:

  (i) Annual base starting salary;

  (ii) Employee perquisite costs; and

  (iii) Employee benefit costs;

  in excess of the amounts which would have been incurred for the "Key Employee" if you had not lost the services of the "Key Employee." But we will not pay more for these expenses than 10% of the amounts which would have been incurred for the "Key Employee."

c. First year costs of the replacement employee's training and education if the training and education is necessary for the replacement employee to perform the duties of the applicable position listed in the definition of "Key Employee" with the same quality of service as the "Key Employee."

Insurance under this endorsement for these expenses will apply only if the permanent replacement for the "Key Employee" is appointed or hired within 180 days after the date of your permanent loss of the services of the "Key Employee" caused by a "covered accident."

But "Key Employee Replacement Expense" does not mean any of the following:

a. Except as provided in paragraph 3.b above, salary, wages, or benefits of you, your employees, your temporary workers or "volunteer workers";

b. Costs to acquire, repair or replace real or personal property;

c. Your loss of business income;

d. Your expense to hire a public adjuster or appraiser or any other claim adjustment expenses incurred by you.

e. "Bodily injury," "property damage," "personal and advertising injury," or any expense or other coverage this policy provides, other than this **KEY EMPLOYEE REPLACEMENT EXPENSE COVERAGE ENDORSEMENT**.

C. "Covered Accident" means a sudden and unexpected "incident," not otherwise excluded in this endorsement, which solely and independently of any other cause results in the "Key Employee's":

1. Death; or

2. Permanent disability, meaning the permanent physical inability, or mental inability due to a permanent physical inability, of the "Key Employee" to perform the normal duties of the applicable position for which the individual qualifies as a "Key Employee"

within one year after the date of the sudden occurrence.

C. "Key Employee" means of the following officer and employment positions:

1. Chief Executive Officer;

2. Chief Operating Officer;

3. Chief Financial Officer;

4. Corporate Secretary;

5. Treasurer;

6. Executive Vice President; and

7. Risk Manager.

D. The following is added to the definition of "incident"

  c. With respect to Key Employee Replacement Expense Coverage, "incident" means a "Covered Accident."

All other terms, conditions and exclusions of this policy remain unchanged.

Copyright 2010, CNA Financial Corporation



G48437A
(Ed. 10-11)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## WAIVER OF SUBROGATION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA PLUS COVERAGE PART

We will waive any right of recovery we may have against the person or organization shown in the schedule below because of payments we make for injury or damage arising out of your work, done under a contract with that person or organization. The waiver applies only to that person or organization shown in the schedule below:

Name of Person or Organization:

GROUCHER COLLEGE



All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

G48437A (Ed. 10-11)
Page 1 of 1

Policy No:
Endorsement No:
Effective Date:

Insured Named:

Copyright, CNA  All Rights Reserved.



# IMPORTANT INFORMATION

**from the member companies of CNA Insurance (CNA)**

## FOR ALL COMMERCIAL LINES POLICYHOLDERS

Dear Policyholder:

The Maryland Legislature requires that insureds be notified if their insurer considers claims history for the purpose of refusing to renew their coverage. Therefore, this notice serves to disclose to our policyholders that the underwriting decision to non-renew your policy is based in part upon your claims history.

If you have any questions or desire additional information about this matter, please contact your agent.



# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

4OD200020011795328653

 Copyright, Insurance Services Office, Inc., 1998



CNA68021XX
(Ed. 02/13)

# NOTICE OF CANCELLATION TO CERTIFICATEHOLDERS

It is understood and agreed that:

If you have agreed under written contract to provide notice of cancellation to a party to whom the Agent of Record has issued a Certificate of Insurance, and if we cancel a policy term described on that Certificate of Insurance for any reason other than nonpayment of premium, then notice of cancellation will be provided to such Certificateholders at least 30 days in advance of the date cancellation is effective.

If notice is mailed, then proof of mailing to the last known mailing address of the Certificateholder on file with the Agent of Record will be sufficient to prove notice.

Any failure by us to notify such persons or organizations will not extend or invalidate such cancellation, or impose any liability or obligation upon us or the Agent of Record.

CNA68021XX (Ed. 02/13)
Page 1 of 1

Copyright, CNA  All Rights Reserved.

 333 So. Wabash
Chicago, Illinois 60604

| Policy Number | Policy Period | | Coverage Is Provided By | Agency |
|---|---|---|---|---|
| | From | To | | |
| B6011795632 | 11/01/17 | 11/01/18 | Continental Casualty Company | 982158505 |

| Named Insured And Address | Agent |
|---|---|
| MORABITO CONSULTANTS INC<br>952 RIDGEBROOK RD<br>SUITE 1700<br>SPARKS GLENCOE, MD  21152 | MASON & CARTER INC<br>23 SOUTH STREET<br>BALTIMORE, MD 21202 |

**   PAYMENT  PLAN  SCHEDULE  **

THE  BILLING  FOR  THIS  POLICY  WILL  BE
FORWARDED  TO  YOU  DIRECTLY  FROM  CNA.

THE  PREMIUM  AMOUNT  FOR  THIS  TRANSACTION
IS      ██████████  .

THIS  PREMIUM  WILL  BE  INVOICED  BY  CNA  ON
A  SEPARATE  STATEMENT  ACCORDING  TO  THE
PAYMENT  OPTION  YOU  SELECT.

ISSUE DATE 09/17/17





**END OF COPY**